**NORTH AMERICAN AVIATION, Inc., OF KANSAS v. UNITED STATES.**

No. 46314.

Court of Claims.

Oct. 7, 1946.

Arthur H. Deibert, of Los Angeles, Cal. (Thomas R. Dempsey, of Los Angeles, Cal., on the brief), for plaintiff.

John A. Rees, of Washington, D. C., and Sewall Key, Acting Asst. Atty. Gen. (Helen R. Carloss and Fred K. Dyar, both of Washington, D. C., on the brief), for the United States.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

LITTLETON, Judge.

Plaintiff seeks to recover $50,000, paid under protest, as a special excise capital stock tax with respect to the carrying on or doing business for the short period of plaintiff's existence as a corporation prior to July 1, 1941.

Plaintiff's amended petition sets forth two causes of action, the second being in the alternative.

In the first cause of action plaintiff seeks to recover the amount mentioned on the ground that it was not engaged in carrying on or doing business within the meaning of the taxing act prior to July 1, 1941, and that no special excise tax on the declared value of its capital stock was therefore due for that period.

In the second or alternative cause of action it alleges and claims that if the court should hold that the corporation was engaged in carrying on or doing business prior to July 1, 1941, merely because it signed the cost-plus-a-fixed-fee contract entered into between the plaintiff, the General Motors Corporation (Fisher Body Division), and the Government, on June 27, 1941, the special excise tax of $50,000 paid at the statutory rate on the declared value of the capital stock was a cost incurred for and incidental to the performance of that cost-plus-a-fixed-fee contract and, as such, was a proper reimbursable item of cost thereunder.

Plaintiff was incorporated on June 24, 1941, and the first meeting of its incorporators was held on that date. At that meeting the board of directors was elected, bylaws were adopted, and the board was authorized to issue shares of capital stock. The board held its first meeting June 26 and took the usual corporate actions, as set forth in finding 5, among which was the authorization to the proper officers of the corporation to issue and deliver to North American Aviation, Inc., 6,000 shares, having a par value of $1 each, of plaintiff's capitol stock in exchange for $3,000,000 cash, being at the rate of $500 a share. In addition the directors authorized certain officers of the corporation to execute a contract with the United States to which the General Motors Corporation (Fisher Body Division) was also to be a party, as the major subcontractor, for the manufacture by plaintiff, in a plant then under construction by the United States in Kansas City, of 1,200 military airplanes, on a cost-plus-a-fixed-fee basis. The contract provided for the manufacture by the General Motors Corporation of certain parts and subassemblies of the airplanes to be manufactured by plaintiff. This work by General Motors was to be paid for by plaintiff out of its fixed fee without reimbursement.

On the following day, June 27, 1941, plaintiff received from North American Aviation, Inc., $3,000,000 in payment for the 6,000 shares of its stock, and, on the same day, plaintiff executed the cost-plus-a-fixed-fee contract with the Government.

The contract was also signed on the same day by the General Motors Corporation (Fisher Body Division), as the major subcontractor, and by the United States by its contracting officer, and was approved June 28, 1941, by the Secretary of War. The plant then under construction by defendant at Kansas City, Kansas, was not completed or ready for use by plaintiff in beginning manufacturing operations until October, 1941.

The contract was prepared and presented by defendant for execution by plaintiff and the General Motors Corporation prior to July 1, 1941, and it was executed prior to the end of the fiscal year June 30, 1941, solely at the request of the United States and for its convenience. Plaintiff had no receipts prior to July 1, 1941, other than the $3,000,000 received for its capital stock, and it made no disbursements for any purpose prior to that date.

The buildings and facilities constituting the plant in Kansas City were built and provided by and at the expense of the United States. Plaintiff's first operations in this plant began October 16, 1941, when the plant was substantially completed, and the first contract flight of airplanes manufactured by plaintiff under the contract of June 27 was accomplished January 3, 1942. Plaintiff carried on no manufacturing operations of any kind prior to July 1, 1941, and engaged in no business activities, other than the making and signing of the contract on June 27, 1941, as hereinbefore mentioned.

The contract with defendant provided that in addition to reimbursement for the cost of performance plaintiff would be paid a fixed fee of $6,540,000, being 5.45 percent of $120,000,000, representing the estimated cost of 1,200 airplanes, as determined by the Secretary of War; and, in addition, a fixed price of $900,000 for engineering information and services to be furnished by plaintiff to the General Motors Corporation for the various subassemblies for the airplanes called for. Payment of the $900,000 for the engineering services was to be made by the United States in monthly installments, based on the percentage of cost of partial performance to date of the monthly payments to the total cost of full performance under the contract. No payments of any kind were made to plaintiff under the contract until after October, 1941.

Upon these facts and under the applicable provisions of the taxing act, Sections 1200 and 1202, Internal Revenue Code, as amended by Section 301(a), Revenue Act of 1941, 26 U.S.C.A. Int.Rev.Code, §§ 1200, 1202, which imposed a special excise tax on the right or privilege of carrying on or doing business in corporate form, and under the provisions of Treasury Regulations 64, arts. 41–44, inclusive, we are of opinion that the making of the agreement and the execution of the contract of June 27, 1941, with the United States and the General Motors Corporation, constituted the carrying on or doing business by plaintiff. Magruder v. Washington, Baltimore & Annapolis Realty Corporation, 316 U.S. 69, 70–73, 62 S.Ct. 922, 86 L.Ed. 1278; Associated Furniture Corporation v. United States, 44 F.2d 78, 70 Ct.Cl. 517; Cargill, Inc., v. United States, D.C., 46 F.Supp. 712.

The making of the agreement with the Government for the manufacture of 1,200 airplanes and the furnishing of the engineering services mentioned, and the execution of the formal contract embodying the terms and conditions of that agreement appear to us to have been an important business activity and, since this occurred prior to July 1, 1941, we think the statutory condition for the imposition of the special excise tax, namely, the carrying on or doing business, is satisfied by these business activities of the corporation. The phrase "doing business" is a comprehensive term and, in particular, embraces any business activity as that term is generally and ordinarily understood by the laymen. Flint v. Stone Tracy Company, 220 U.S. 107, 31 S.Ct. 342, 55 L.Ed. 389, Ann.Cas.1912B, 1312. The exercise of business judgment in relation to matters and activities, for the carrying out of which the corporation was organized, has been held to be a business activity sufficient to constitute doing business within the meaning of the statute.

1014

Section Seven Corporation v. Anglim, 9 Cir., 136 F.2d 155; Kettleman Hills Royalty Syndicate No. 1 v. Commissioner of Internal Revenue, 9 Cir., 116 F.2d 382. The entering into contracts pursuant to a charter power for the purchase of elevators and warehouses before the corporation began the actual operation of the business was held sufficient to sustain the excise tax with respect to the carrying on or doing business. Cargill, Inc., v. United States, supra, and the same rule was applied in Associated Furniture Corporation v. United States, supra.

Treasury Department regulations 64, in effect on June 30, 1941, relating to the special excise tax with respect to the carrying on or doing business provided, so far as material to the first cause of action, as follows:

"Art. 41. Nature and rate of tax.—The tax is an excise tax imposed with respect to carrying on or doing business during a taxable year ending June 30, or any fractional part thereof. It is an excise tax upon the exercise of the privilege of doing business and not upon the business itself and is imposed upon each corporation with respect to carrying on or doing business and not upon each business carried on. * * * The tax may not be apportioned under any circumstances. If a corporation is engaged in business for any portion of a taxable year, liability for the tax is incurred for the entire taxable year.

"Art. 42. Doing Business.—The term "business" is very comprehensive and embraces whatever occupies the time, attention, or labor of men for profit. Accordingly, regardless of the nature of its activities, any corporation organized for profit and carrying out the purpose of its organization is doing business within the meaning of the Act. Similarly, even if not organized for profit, any corporation which nevertheless engages in activities ordinarily carried on for profit is also doing business. It is immaterial whether the activities result in a profit or a loss, whether the corporation has been successful in its enterprise, or that because of unfavorable business conditions, no operations are carried on for a particular period. No particular amount of business need be done, nor is it necessary that the business be continuous throughout the taxable year.

"The case is exceptional in which the activities of a corporation organized for profit do not amount to doing business within the meaning of the Act. Such a case is generally limited to one in which the corporation is not pursuing the ends for which organized, i. e., profit.

"Art. 43. Illustrations.—(a) General.— In general "doing business" includes any activities of a corporation * * *.

*     *     *     *     *     *

"(b) Exceptions.—Ordinarily the exceptions to 'doing business' are restricted to limited activities of a corporation. For example—

*     *     *     *     *     *

"(2) A corporation may complete its organization and sell its capital stock for cash without incurring liability. However, the exchange of its capital stock for property other than cash or the use of the proceeds from the sale of its capital stock for the purchase of property are corporate business acts and constitute doing business. Entering into contracts for the purchase of property or the construction of a plant are also corporate acts and constitute doing business. In other words, it is not necessary that a corporation be actually engaged in the manufacture of its intended product or that it be actually creating profit or gain to incur liability, since making contracts, buying materials or machinery, and employing and discharging individuals are necessary business acts leading to the ultimate attainment of the object and purposes for which the corporation was created and has its existence."

The business activities engaged in by plaintiff between June 26, and June 30, 1941, amounted to "doing business" within the meaning of the taxing statute as interpreted by the regulations above quoted. We think these regulations are reasonable and that they properly interpret and apply the special excise tax provisions of the statute. Plaintiff is therefore not entitled to recover the capital stock tax of $50,000 as an overpayment under its first cause of action.

Under the second or alternative cause of action we are of opinion that plaintiff is entitled to recover as a reimbursable item the excise tax of $50,000 paid as a proper reimbursable item of cost incurred and paid for and incident to the performance of the cost-plus-a-fixed-fee contract June 27, 1941. Flint v. Stone Tracy Co., 220 U.S. 107, 31 S.Ct. 342, 55 L.Ed. 389, Ann.Cas.1912B, 1312; William Cramp & Sons Ship & Engine Bldg. Co. v. United States, 72 Ct.Cl. 146. The sole business in which plaintiff was engaged in 1941 was the preparation for performance and the actual performance in part of the contract of June 27.

Article 3 of the contract contained certain provisions for reimbursement to plaintiff of the cost of performance and, in addition to these provisions, incorporated as a part thereof Treasury Decision 5000 (Internal Revenue Cumulative Bulletin, 1940, Vol. 19, Part 2, P. 397) theretofore prepared, approved and promulgated by the Secretary of the Treasury, the Secretary of War, and the Secretary of the Navy (finding 9). This Treasury Decision was signed by the Secretary of War August 2, 1940. It was originally prepared and published for the purposes of determining costs under contracts for the purpose of fixing and determining the amount of excess profits under such contracts to be paid into the Treasury by the contractor under the provisions of the Vinson Act of March 27, 1934, 48 Stat. 504, 34 U.S.C.A. § 495, and the National Defense Act of June 28, 1940, 54 Stat. 676, 677, 50 U.S.C.A. Appendix, § 1152. Under this Treasury Decision and by separate rulings excise taxes with respect to the carrying on or doing business were held to constitute proper reimbursable items of cost of performance of cost-plus contracts. The contract provided in section 26.9 of T.D. 5000, Article 3, that "Among the items which shall not be included as a part of the cost of performing a contract or subcontract or considered in determining such cost, are Federal and State income and excess profits taxes * * *." Other taxes on transfers of stock, etc., were also excluded as reimbursable items of cost. Excise taxes on the right or privilege of doing business were not excluded as allowable items of cost; they were not expressly mentioned in the contract. In addition to these provisions paragraph (c) (2) of article 3 of the contract provided that "All costs which have been incurred by the Contractor or North American Aviation, Inc., in anticipation of this contract and prior to the signing thereof, and which if incurred after the signing of this contract, would have been considered as allowable items of cost within the meaning of this Article, shall be allowable items of cost hereunder."

The express exclusion of Federal and State income and profits taxes and certain other taxes as unallowable items of cost implies that the excise tax on capital stock, which had been in existence since 1917, was considered an allowable reimbursable item of cost when the contract was prepared and executed, or, at least, that such excise tax on the right or privilege of carrying on or doing business was not among the items of cost of performance or preparation for performance of the contract to be excluded. On the record we must hold that the parties and the contract as drawn by defendant intended that the capital stock tax paid by plaintiff for the period ending after the contract was executed on the value of the capital stock as declared by the corporation under and pursuant to existing law should and would be an allowable item of reimbursable cost.

Exise taxes such as are here involved, and frequently referred to and designated as franchise or privilege taxes, are recognized and uniformly treated, under Treasury rulings and well established principles of accounting, as an expense of doing business and as an allowable item of cost of performing a contract. In I.T. 3398(1940), Cum.Bull.1940-2, P. 396, the Treasury Department published a decision for the guidance of the War and Navy Departments in which it was held that an excise or franchise tax with respect to the carrying on or doing business was an allowable item of cost under a cost-plus contract and properly allowable as a reimbursable item of cost of performance of such a contract. In addition to the above the Secretary of

War ruled in War Department Technical Manual, TM 14—1000, approved March 1, 1944, and entitled "Administrative Audit Procedures for Cost-Plus-a Fixed-Fee Supply Contracts," that "The capital stock tax has been held to be an excise tax for the privilege of doing business as a corporation. Flint v. Stone Tracy Company, 220 U.S. 107, 31 S.Ct. 342, 55 L.Ed. 389, Ann. Cas.1912B, 1312. As a necessary cost of doing business it is a proper reimbursable cost." However, the Secretary, as set forth in paragraph 285 of TM 14—1000, sought, for some unexplained reason, to place a limitation upon the amount of such excise tax that would be allowable as a reimbursable item of cost under the contract. We are unable to find any justification in the contract or in the record for the limitation so worked out. The defendant does not here attempt to justify or sustain it.

In this case defendant expressly admits that under the terms of the contract of June 27, 1941, the excise tax imposed by Congress with respect to the right to carry on or do business was a proper reimbursable item of cost under the contract and agrees in principle with plaintiff's contention. Defendant contends, however, that plaintiff should not be allowed to recover as a reimbursable item the full amount of $50,000 excise tax paid for the sole reason that such tax was paid at the statutory rate upon the value of the capital stock as declared by the corporation rather than upon the basis of what the stock may be said to have been fairly worth on June 30, 1941. Defendant therefore insists that since plaintiff has not sustained the burden of proof by showing the fair actual value of the capital stock on June 30, 1941, the petition should be dismissed. We cannot agree with this theory of reimbursement. On this record we cannot say that plaintiff so unreasonably inflated the declared value of its capital stock as to defraud the Government. Plaintiff has made a prima facie case under the law and the terms of the contract, and if there was any attempt to defraud the Government in any way the burden of proof as to that fact was on the defendant. Defendant argues that by declaring a high value for its capital stock plaintiff would pay less declared value excess profits tax, by reason of a larger credit against net income on account of the capital stock tax paid, than it would pay on the basis of a valuation of the capital stock substantially in accord with its actual value on June 30, 1941. That would be true in any case, and the difficulty with this argument is that the taxing statute and the contract authorized and permitted plaintiff to declare the value of its capital stock for all purposes and the amount of capital stock tax reimbursable under the contract had no effect upon plaintiff's fixed fee thereunder. Moreover, it appears from the record that plaintiff was not liable for any declared value excess profits tax for its income-tax taxable year 1941 even if it had declared a much lower value for its capital stock. The law required plaintiff to declare a value for its capital stock on June 30, 1941, and made such declaration of value conclusive for a period of three years. Treasury Regulations 64, Article 44, in effect during 1941, provide that a corporation may for any declaration year "exercise unrestricted judgment and discretion in determining the value to be declared for its capital stock" and that "Extreme care should be exercised in making the declaration of value, since once made it cannot be changed, amended, or corrected, except as otherwise provided in this article, either by the corporation or the Commissioner [the Government]. It is not only binding with respect to the year for which declared, but it is also the basis for computing the adjusted value for any succeeding adjustment year or years of the three-year period, and constitutes a prime factor in computing the excess profits tax, if any, for the applicable income-tax taxable year."

At the time Treasury Decision 5000 was prepared and published in 1940, and at the time the contract of June 27, 1941, was prepared and executed the excise tax here involved and the related excess profits tax had been in effect without change, except as to rate, for eight years; having been imposed in its present form on June 16, 1933. (Prior to that time the capital stock tax had been imposed on the basis of the fair value of the capital stock.) The par-

ties to the contract of June 27, were fully aware of the tax and the manner in which it had been imposed and was to be determined and computed. They were also aware of the fact that the corporation was permitted and required by the statute to declare the value for its capital stock as the basis for the capital stock excise tax for three-year periods at the rate specified. In addition, they were aware of the fact that the statutory credit of a certain percentage of the declared value for the capital stock would have an effect upon the amount of profits tax that might be payable by the corporation if it had a net income over a certain amount. They were further aware of the fact that the full amount of the capital stock excise tax paid for any year was a proper allowable item of reimbursable cost under cost-plus contracts, as had been ruled by the Treasury Department. The parties to the contract therefore had at hand all the knowledge and means necessary to place a limitation on the reimbursement for the capital stock tax had they desired or intended that there should be such a limitation. Since they did not provide for such a limitation but on the contrary made a contract which provided for full reimbursement, we cannot rewrite or amend the contract which the Government elected to make. If the situation were reversed on account of plaintiff having declared a low value, and, by reason of having obtained other business during the three-year declaration period had become liable for a much higher excess profits tax than it had anticipated, the Government certainly would not be willing and could not be called upon to reimburse or compensate plaintiff for the unanticipated high declared value excess profits tax.

Plaintiff is entitled to recover under its second cause of action, and judgment will be entered in its favor for $50,000. It is so ordered.

WHALEY, Chief Justice, and JONES and WHITAKER, Judges, concur.

MADDEN, Judge, took no part in the decision of this case.